Good morning, Your Honors. May it please the Court. My name is Catherine Alfieri, and I represent the appellant, Troy Urie, in this matter. Mr. Urie comes before the Court today to request this Court's de novo review and ultimate reversal of an errant district court order denying his motion to dismiss the current indictment on collateral estoppel and double jeopardy grounds. The essence of appellant's claim on appeal is that prior juries, beyond a reasonable doubt, sentencing verdict, which was rendered in a 2004 Sacramento, we'll call it the Sanmina fraud trial, necessarily acquitted him of the precise conduct, which has to do with a separate fraud called the adjuvant fraud case, upon which the current prosecution is based. And thus, because these ultimate facts were decided in his favor in that prior proceeding, the constitutional protection against double jeopardy, which embraces the doctrine of collateral estoppel on this particular issue, bars this prosecution. And although the district court unfortunately subscribed to the government's errant view that it wasn't possible to divine this jury verdict and determine what it meant and could not determine whether the Sanmina jury found that the defendant was or was not liable for the adjuvant conduct, I believe that utilizing the Ashby-Swenson court's instruction to review the entirety of the record, including the pleadings, the arguments of counsel, the jury instructions, the evidence deduced at trial, and basic deductive reasoning, the only rational conclusion to reach is that the jury verdict necessarily acquitted Mr. Urey of the current adjuvant conduct. Counsel, could you expound on that theory by telling us the context in which what was the procedural device under which this evidence was presented to the jury? At the guilt phase, the evidence was deduced under 404B. Right. As other act evidence. Why doesn't the Supreme Court case of United States v. Felix bar us from considering that as a prosecution? Well, I'm not asking you to find it as a prosecution. What we're saying is that it was an issue decided in the defendant's favor, and that the utilization of the 404B evidence in the guilt phase of this proceeding is not that issue. What's at issue is that the government then took that evidence, relied upon it specifically, and asked the jury to return, because it was in the catch between Blakely and Booker, and asked the jury to return a sentencing verdict beyond a reasonable doubt, finding that Mr. Urey was liable for those losses. And so we're not making a straight-up double jeopardy argument. We're making a collateral estoppel argument that there was a prior issue that was determined in Mr. Urey's favor in that prior proceeding. In the sentencing? Yes. In the sentencing proceeding, there was a beyond. How in the world can you tell that from looking backwards on the sentencing? Well, I mean, it could have gone one way, it could have gone the other way, but you can't tell. Well, I think you can tell. Why? And I'll tell you why. Because here's what we know in this case. We know that there was a jury-intended-loss verdict of $1 million to $2.5 million returned. There's three possible options. Either ---- Doesn't that defeat your argument, the fact that there are three possible options? There are three possible options, and two are not rational. So I'm trying to give you the analysis. One option is that it's the adjuvant conduct alone. We know that's not possible because there's $730,000 of loss, not a million. So we know it can't be that. Can it be a combination of both adjuvant losses and Sanmina losses? It can't be that. Why can't it be that? Because in order to ---- in order to, for the adjuvant losses of $730,000, to be part of the $1 million to $2.5 million judgment, the jury would have had to hold Mr. Urey liable for a loss range in the Sanmina case of $400,000 to $1 million. But a jury can always have a compromise on that. It didn't have to make the same holding to the dollar. Well, I would suggest to the Court that if we presume that juries follow ---- if we assume that juries follow instructions, and the record reveals that the jury was properly instructed on how to calculate intended loss, and they were to base it on the evidence, and the evidence only mentions there's only three pieces of evidence that have to do with intended loss, there's a $400,000 to $1 million range that is connected to the minor mope level of co-defendants McGuire and Blanchard, there's the $730,000 in adjuvant losses, and there's an $11 million figure of the total Sanmina losses. That's the evidence in the case. There's no other evidence for the jury to base their verdict upon. And I would suggest to the Court that ---- Would the jury have found $11 million? It could have. It chose not to. It clearly would have. The judge didn't really instruct us the exact amount. The judge just instructed us how the jury could arrive at things. Yes, the judge clearly, in his instructions, gave the jury the option. But there was a special verdict in this case, and that special verdict form tracked the USSG 2B 1.3 levels of intended loss, $50,000, I think $400,000, $1 million, $2.5 million, $7 million, $11 million, over $7 million. I think the next one's $20 million. And the jury had an option of which of those to choose. What if the jury had found $10 million? Well, I think I'd be out of gas, because I wouldn't be able to deduce how ---- But that would have been proper under the instructions. If the jury had come up with a $10 million verdict, I think I wouldn't have had a collateral estoppel argument to predicate ---- No, I'm not sure you do now. Okay. Well, I appreciate the Court's candor. Well, it is our view that in looking at the verdict and what it represents, there is only one rational option, and that is that the jury verdict only reflects the Sanmina conduct. It does not reflect the adjuvant losses. And then the question becomes, what then? What does an intended loss verdict, which exclude the adjuvant losses, mean? Well, it means, again, one of two things. Either the defendant was not a participant in the adjuvant scheme, or the adjuvant scheme was not part of the same course of conduct or common scheme or plan. Counsel, in your argument, do you account for the possibility that the jury could have attributed the million dollars to the acts of the co-defendants? Yes. In your argument. Well, Your Honor, to be quite honest, it doesn't do ---- it doesn't change my argument simply because the amounts of loss are cumulative for all defendants and co-defendants in this case. There is an actual loss in the adjuvant case of $730,000 that is on behalf of all defendants. There is a $11 million. It's the amount of the loss of the scheme of all participants. So it accounts for the loss of the scheme involving all participants. It doesn't necessarily ---- It's not a separate ---- there's no other separate amounts coming into play. But the jury could have reached a million dollars based on the co-defendants' conduct as opposed to the defendants' conduct. Couldn't they, the amount of loss? It's all the same in this case. The schemes are ---- the intended loss in the adjuvant scheme is $730,000. It's an actual loss sustained. So if you added the million dollars from the Sanina case and then the $700,000 from the adjuvant fraud, why wouldn't ---- that's what ---- that's your argument. That's why. The argument is that you can't do that, because in order to do that, the jury would have had to have found, based on the evidence in this case, that that $400,000 to $1 million range, which was stipulated in the evidence below, only related to minor ---- this minor level of participant in this scheme. In this case, the two co-defendants Blanchard and McGuire. This was not an issue the defense inserted into the case. It's an issue that the government inserted because they reached cooperation agreements with both McGuire and Blanchard, and they found that they were at a minor level and that they were at $400 to $1 million in reasonably foreseeable loss from the Sanmina scheme. Defense counsel tried to argue that Mr. Urey was a co-equal of these co-defendants and should be held liable for the $400 to $1 million on the Sanmina scheme. The government argued, obviously, that he was not a co-equal. The evidence did not indicate that he was a co-equal. And in fact, the jury rejected Mr. Urey as a co-equal by finding him to be a supervisor or manager and not a minor or a MOPE-level participant in this scheme. So I think the evidence, if we look at the evidence, there's only ---- there's nowhere to go, but the rational explanation is that the jury found that Mr. Urey was not a co-equal, that the losses were solely Sanmina losses, and that Mr. Urey was not a participant in the Agilent scheme.  Thank you. Thank you. Ms. Rosen. Good morning. Good morning. Amber Rosen, representing the United States in this matter. Thank you, Your Honors. Defendant's claim of collateral estoppel is not colorable, and this Court does not even have jurisdiction to hear it. And at the very least, as this Court seems to recognize, the claim has no merit and should be denied on that basis. To warrant issue preclusion, the defendant has the burden of establishing that the issue which they seek to foreclose from relitigation was necessarily decided in the prior proceeding. And this defendant has not and cannot establish that the jury's loss determination from the Sanmina trial necessarily decided that he was not involved in the Agilent scheme. Any parsing of the verdict is really nothing more than speculation. In terms of the jurisdictional issue, this Court construes the collateral ---- How would the jury have come to that conclusion without including the 700,000 plus? Well, the defense counsel's theory is that the jury believed that the Sanmina loss was based on the amount of proceeds that the government argued the defendant received from the Sanmina scheme as opposed to what the overall intended loss from that scheme was. And the government had suggested that the amount of his cut was going to be probably somewhere between $1 and $2 million. So her theory, or the defendant's theory, is that the $1 to $2.5 million loss the jury came back with must have adopted that and didn't include the Agilent scheme. I understand what her theory is. Oh, I'm sorry. What I wanted to find out is what your theory is, how the jury arrived at it. Well, our theory is that you really can't know and that there's a number of different possibilities. One possibility is, as she claims, one possibility is that the defense ---- is that the jury believed that the Sanmina scheme maybe was between $1 and $2 million and they found it to be, let's say, $1.5 million and then added the Agilent losses of $730,000 to that to arrive at the range of $1 to $2.5 million. Another possibility is that they did what defendants' prior defense counsel suggested at the Sanmina sentencing, which was that the jury found that the loss from Sanmina was between $400 and $1 million because that's what the co-defendants were found liable for, and then added the $730,000 loss from Agilent to that to get to the $1 to $2.5 million loss range. So there's many ---- another possibility ---- Can you add it up? Sure. That would be $400,000 to $1 million plus approximately $700,000 would be $1.1 to $1.7 million, which is within the loss range that the jury found. So those are all possibilities, which is why the defendant's claim clearly falls on the merits. In fact, though, her claim is not even colorable. Under the ---- this Court's decision in zone, where there's no set of facts or viewing the evidence in the light most favorable to the defendant, the defendant still can't prevail. The Court suggested there that a claim is not colorable. And here, that's the situation we have. Even if we assume all of the facts, as defendants suggest, that the jury couldn't have found the $400 to $1 million loss from Sanmina because of his role in the offense, and that the loss range necessarily ---- I'm sorry, that the loss was the $1 to $2.5 million was all from Sanmina based on the cut that the defendant got from that. Even under that theory, she loses because it's still possible that the ---- that the jury simply added the $700,000 to the couple of million that they believed the $1 to $2 million that they thought the defendant got from Sanmina. So to that extent, the claim is not even colorable because even under her theory of the way the jury must have determined the facts from the evidence and the instructions, she would lose. Moreover, it's the kind of claim that can never prevail because whether to multi-factor consideration for the jury. It wasn't dependent simply on his involvement. They also needed to find that it was relevant conduct and that the $700,000 loss was foreseeable to the defendant. So if they ---- even if their verdict didn't include the loss, we can't tell whether it was because they found he was not involved or whether it was because they believed that it wasn't part of the same course of conduct or because it wasn't foreseeable to him. Those were both open issues for the jury to decide. The defendant indicates in her brief that the defense somehow conceded that the agile in conduct was relevant conduct, but it did not concede that to the jury. It simply didn't address it because the defense's argument was that he was not involved. But in fact, it was an issue that was put forth to the jury. The jury was instructed that they could consider any losses that were part of the same course of conduct. But they received no instruction as to how to evaluate what is considered the same course of conduct. So it's possible that they believe that since there was no evidence that the two schemes were planned at the same time or that because the schemes occurred three months apart, that they believed it wasn't part of the same course of conduct. We simply can't know that, but that was certainly a factual determination that they needed to make. I want to just address briefly the defendant's argument that somehow the finding on the role in the offense meant that the jury could not have found that the loss for the sand mean was between $400 and $1 million because I think that really misstates the law. This Court, I'm sure, is aware the test for determining loss is completely separate from the factors that a jury would consider in determining role in the offense. And while the parties argued that the defendant's role ought to have some bearing on what the loss was, they certainly received no instruction that they must equate the role with the loss. And so I think her argument is specious to that effect. Just sum up, because there are so many different rational possibilities to support the jury's verdict and because the defendant, even under their own interpretation, couldn't prevail, we would ask this Court to deny the appeal both for lack of jurisdiction and on the merits. I want to just, as one last thing, to let the Court know, in case it wasn't aware, that the trial in the case has been set by the district court for March 31st. So we're hoping, because there is this jurisdictional question pending, to get a ruling perhaps before then, although I know that puts the Court on quite an expedited schedule. But that's what the proceedings are in the district court at this point.  Thank you, Ms. Brown. Thank you. Eight seconds worth of... Apparently it's good for bull riding, but not much else. I would simply ask the Court to review our reply brief, wherein each of the arguments proffered by the government has been resoundingly demonstrated, and proven, that they are not based in the record below. And I thank the Court for their time. Thank you. All right. Thank you, counsel. Both of you. The matter just argued will be submitted. And we'll next hear your argument in Rodriguez. Thank you, Ms. Brown. Thank you. Thank you.
judges: Hug, Rymer, Rawlinson